# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 6, 2009

## STATE OF TENNESSEE v. JOSEPH RAY PINSON

**Direct Appeal from the Circuit Court for McNairy County**
**No. 2239     J. Weber McCraw, Judge**

**No. W2008-01010-CCA-R3-CD  - Filed April 9, 2010**

The Defendant-Appellant, Joseph Ray Pinson, was convicted by a McNairy County jury of rape of a child, a Class A felony. He was sentenced as a child rapist to twenty years in the Tennessee Department of Correction. Pinson claims on appeal that the evidence was insufficient to support his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Rickey W. Griggs and Shana Johnson, Assistant Public Defenders, Somerville, Tennessee, for the Defendant-Appellant, Joseph Ray Pinson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Bob G. Gray, Assistant District Attorney General, for the Appellee, State of Tennessee.

**Facts**. A grand jury in McNairy County indicted Joseph Ray Pinson for two counts of rape of a child and the misdemeanor offense of failure to appear.[1] Count one of the indictment charged:

> JOSEPH PINSON on a day between April 1, 2007 and April 30, 2007, in McNairy County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly sexually penetrate C.M. [("the victim")], a person more than three (3) years of age but less than thirteen (13) years of age, in violation of T.C.A. 39-13-522, against the peace and dignity of the State of

---

[1]The judgment form shows that the charge of failure to appear was dismissed/nolle prosequi.

Tennessee.[2]

The following testimony was presented at trial:  Dr. Lisa Piercey testified that she is a child abuse pediatrician at The Jackson Clinic.  The trial court determined that she qualified as an expert in the field of child abuse pediatrics.  Dr. Piercey said she evaluated the victim on May 7, 2007 at the Madison County Child Advocacy Center in Jackson.  The victim was seven years old at the time of the examination.  The examination lasted about an hour, and she documented her findings in a written report.  Dr. Piercey testified that while taking the patient history, the victim was active and gave no indication that he was trying to be deceptive or untruthful.  She discussed the issue of inappropriate sexual contact with the victim, and she testified that:

> [The victim] gave names correctly to several of his body parts, including he called his genitals his private part and his bottom, his butt.  He correctly identified good touches and bad touches like I told you before.  And then, as I always do, I said, "Have you ever had any bad touches" and the children usually – if they say yes, I'll say, "Tell me about that," and his spontaneous statement was, "Yeah, from Joseph Pinson.  He's 23 and his wife, Lana, she's 28, knew about it."
>
> And so when I went on to ask him to expand on that statement, I asked him specifically "what kind of bad touches did Joseph give you." [ The victim] reports that Joseph, in his own words, "touched my private part and my butt with his hands and he put his private part in my butt."  And he stated that this happened four or five times, with the last time being about a week ago but he doesn't remember exactly when the first time was, but he knew that he was in the first grade.  So he was at the end of his first grade year but he knew it was sometime when he was in the first grade.
>
> When I asked who Joseph was, he said Joseph is the husband of his babysitter, Lana.  And he said that this happened while they were babysitting him and that it happened, I think I've already said, four or five times.  It usually happened in Joseph's bed[.]

Defense counsel objected to Dr. Piercey's testimony on the grounds that the events she described occurred outside of the dates set forth in the indictment, which are between April 1, 2007 and April 30, 2007.  To address the objection, the trial court permitted the State to question Dr. Piercey outside the presence of the jury.  The State asked Dr. Piercey

---

[2]The language in count two is substantively identical to the language in count one.

"whether the acts of penetration occurred on like four or five different events or whether it was four or five penetrations on one event." Dr. Piercey responded, "That was not clear from me talking to him." She said the victim only gave "the description of one particular event." Dr. Piercey also referred to the following statement from her report: "[The victim] states that this happened '4 or 5 times,' with the last time being 'about a week ago'; he doesn't remember exactly when the first time was but states that he was in the 1st grade." The trial court then instructed Dr. Piercey to limit her testimony to the events occurring in April of 2007.

The jury was brought back into the courtroom, and the State questioned Dr. Piercey about what the victim said transpired in April of 2007. Dr. Piercey stated:

> The event he described in detail states that it was a week – "about a week ago," a week prior to May 7th and it was when Joseph and Lana were babysitting him. It occurred in Joseph's bed and Lana was asleep in the same bed. He states that Joseph told him "don't tell anybody or I won't be your friend."
>
> When I asked him to give more details about what happened, he states that Joseph would be naked and then "pull my pants down and stick it in my butt." He also states that "Joseph put his tongue in my mouth and put his mouth on my private part."
>
> . . . .
>
> When asked if he ever had to put his mouth on Joseph's private part, he states no. When asked if he ever saw anything come out of Joseph's private part, he states no. When asked what made the event stop, he states, "when Lana woke up because the bed was moving."

Dr. Piercey performed a physical examination of the victim. She said he had two fissures, or tears, in his anus. Dr. Piercey explained that fissures result from either penetration or constipation. Based on the patient history, she determined that the fissures did not result from constipation. Dr. Piercey testified that her findings from the anal exam were consistent with the victim's statement about being penetrated. She did not attempt to collect DNA from the victim because the cutoff date for DNA collection is seventy-two hours after the incident occurred.

On cross-examination, Dr. Piercey testified that she questioned the victim and his caretaker about the issue of constipation. Dr. Piercey said she mistakenly did not include the

results of her inquiry in her report. She believed the victim suffered the fissures within two weeks of the physical examination. Dr. Piercey acknowledged that she could not tell from the physical examination alone whether the fissures were caused by penetration or constipation.

Investigator Allen Strickland of the McNairy County Sheriff's Department testified that he received a report on April 26, 2007, regarding the possible sexual abuse of the victim. He went to an emergency room on that day and witnessed a forensic interview of the victim. The interview was conducted by someone trained to interview children who are the victims of physical or sexual abuse. Investigator Strickland was not in the room during the interview, but he was able to see and listen to the interview by way of closed circuit video and audio equipment. He also watched the interview from the room next door. Investigator Strickland testified that the victim answered questions clearly and gave no indication that he was being deceptive or untruthful.

Investigator Strickland testified that during the forensic interview, the victim recalled that a specific poster was on the wall of Pinson's bedroom. The victim said the poster was of a female dressed only in her panties. Investigator Strickland stated that on April 30, 2007, he was issued a warrant to search Pinson's home. The record does not include a copy of the search warrant. Investigator Strickland testified that he executed the search warrant on May 1, 2007, and that during the search, he recovered the poster described by the victim. Investigator Strickland said an arrest warrant was issued based upon the forensic interview and the results of the search warrant. The arrest warrant was issued on April 27, 2007. Investigator Strickland was not questioned about the apparent inconsistency in the dates he provided.

The victim's mother testified that she has three children other than the victim. Her children were between the ages of five and eleven, and the victim was eight years old at the time of trial. The victim's mother said Lana Pinson ("Lana") was her best friend for twenty-one years, and Lana babysat her children "quite often." The victim's mother testified that Lana babysat her children for the last time on a weekend in April of 2007. She arranged for Lana to pick up the victim and his brother from school on Friday, April 20. The victim's mother initially testified that her sons stayed with the Pinsons until Sunday. She then said she picked up her sons at "about 5:00" on Saturday. Upon pick-up, she noticed a hickey on the victim's neck. Lana explained that the hickey was there when she picked up the victim from school on Friday. The victim's mother questioned her son about the hickey, and at first he did not say anything that raised concern. Later, however, the victim made disclosures that prompted the victim's mother to take the victim to the Hardin County Sheriff's Department. She was directed to a hospital in Selmer. At some point, the victim was examined by Dr. Piercey. The victim's mother informed Dr. Piercey that the victim was constipated. The

-4-

victim's mother testified that the victim was constipated after she picked up the victim on April 20 and noticed the hickey.

The victim's mother testified that she received about fifteen phone calls from the Pinsons around the time the victim disclosed the misconduct. She answered two of the calls. She said Pinson denied any wrongdoing. On cross-examination, the victim's mother stated that before the victim disclosed the misconduct, Pinson visited her house. He apologized for calling so many times. The victim's mother testified that Pinson "had taken off of work early that day to come to our house to try to talk me into letting him and Lana check [the victim] out of school and I told him no." The victim's mother further explained what transpired when the victim informed her of what occurred at the Pinsons:

> [W]hen [the victim] was telling me what happened, the cell phone was ringing. I looked down; it was them. I didn't answer it. I waited till after we listened to everything [the victim] had to say. I took the phone to my back bedroom and I called them. Lana answered the phone. All she said is, "[the victim's mother], I didn't do it." She handed the phone to Joseph and I had told Joseph what [the victim] had told me and I told him that I was fixing to have him arrested[.]

The victim's mother said the victim did not tell her he was constipated. She explained that he had problems with constipation since the age of three. She concluded that he was constipated because she "noticed his routine as far as when he tells me his stomach hurts." The victim's mother recanted her prior testimony that she told Dr. Piercey about the victim's constipation. She told her family physician, Dr. Peters, about the constipation about two weeks before she learned of the misconduct; however, she did not tell Dr. Piercey about the constipation. She did not recall Dr. Piercey asking about constipation.

On redirect examination, the victim's mother testified that the victim was not constipated during the period from April 20 to May 7. When asked how she knew this, the victim's mother stated, "Because he complained with his butt hurting and . . . we had trouble with him sleeping because he cried from where his butt hurt from the tear." She said she could tell whether the victim was constipated based upon the nature of his bowel movements. On recross-examination, the victim's mother testified that the victim was not constipated during the month of April. She reaffirmed that she knew he was not constipated because he complained of his "butt hurting."

Lana testified that she and the victim's mother became good friends in high school. She recalled babysitting the victim near the end of April in 2007. Lana said she picked up the victim from school and he stayed overnight at her residence. She testified that the

victim's mother picked up the victim the following day on a Saturday. On Friday night, the victim shared a bed with Lana and Pinson. Lana said she woke up during the night because the bed was moving. She stated, "I nudged at my husband and he said he wasn't doing nothing or he was masturbating." Lana heard the victim say, "'It hurt. It hurt.'" After hearing this, Lana "told [the victim] to go to the couch and then me and my husband got into it." Lana and Pinson "had a yelling match," during which Pinson "said he wasn't doing nothing." She was concerned that the victim might have been hurt. Lana acknowledged being scared when Pinson told her he was masturbating. The State questioned Lana about how long the bed was moving before she tried to figure out why. She answered, "I couldn't remember but I think it was like five minutes maybe, five, ten, something. I can't remember." Lana stated that after she nudged Pinson, she told him to leave the victim alone. She testified that in conjunction with her husband's charge of rape, she pled guilty to accessory after the fact.

On cross-examination, Lana testified that she received a two-year sentence as part of her plea agreement. Her sentence was suspended to twenty days on the condition that she testify. Lana reaffirmed that the incident in the bedroom occurred on a Friday night; however, she recalled taking the victim to school the next day. Lana then agreed with defense counsel's statement that the incident in the bedroom did not occur on a Friday night.

Lana said she talked with the victim about what happened in the bedroom. She stated, "At first [the victim] said Joseph did do it and then he told me that – I told him not to lie about it because somebody could go to jail and he said that he was just joking and nothing happened." During the discussion, Lana did not know whether the victim's allegations were true. Lana testified that she was taken into custody by the police, she initially denied any knowledge of the situation. She was arrested along with her husband on April 27. On redirect examination, Lana testified that when the bed started moving, it "felt like somebody was having sex."

The victim testified that he was in second grade at the time of trial. He said he spent the night with Lana and Pinson on more than one occasion, and he always shared a bed with them. The State showed the victim a picture, which he identified as being on the wall in the Pinson's bedroom. The trial transcript does not, however, indicate the content of the picture. The last time the victim stayed at the Pinson's, the victim said he wore blue jeans to bed. He slept in the middle of the bed between Pinson and Lana. The victim did not remember what Joseph was wearing. The victim testified that Pinson gave him a "bad touch." The victim stated, "[Pinson] put his business in my behind." The victim was asked the following:

STATE:    You say he put his business in your butt; is that right?
VICTIM:   Yes.

STATE:     Did it go plumb inside?

VICTIM:    Yes.

STATE:     Did it hurt?

VICTIM:    Yes.

             . . . .

STATE:     What did you do when he put his business in your butt?

VICTIM:    I was crying.

The victim stated that after Lana woke up, "She hit Joseph like that (demonstrating) and Joseph got up and slapped her." The victim testified that on another occasion, Pinson kissed him on his mouth and gave him a hickey on his neck. On cross-examination, the victim stated that the morning after the misconduct occurred, Lana took him to school. He said neither Lana nor Pinson discussed what happened the night before.

Following the proof at trial, the jury convicted Pinson of rape of a child under count one of the indictment. The judgment form for count two–also charging rape of a child–indicates that the trial court granted Pinson's motion for judgment of acquittal. Pinson's brief states that the trial court granted this motion following the State's proof. However, the trial transcript ends at the conclusion of the State's proof.

A sentencing hearing was held, and the trial court sentenced Pinson to twenty years in the Tennessee Department of Correction. Pinson was ordered to serve 100% of his sentence as a child rapist. The judgment form states that the judgment was entered on February 27, 2008.

Pinson filed a timely motion for new trial on March 11, 2008, which challenged the sufficiency of the evidence. The trial court orally denied this motion on April 24, 2008. Pinson filed a notice of appeal on May 12, 2008.

Pinson's appeal originally came before this court without the order denying Pinson's motion for new trial. Consequently, we remanded this case to the trial court to supplement the record with the order. The trial court subsequently added the order denying Pinson's motion for new trial to the record. The filing date stamped onto the order is July 17, 2009; therefore, it appears the order was not entered until after we remanded the case. Pinson's

notice of appeal was filed before the order was entered. Pursuant to Rule 4(d) of the Tennessee Rules of Appellate Procedure, we will treat his prematurely filed notice of appeal as filed after entry of the order denying his motion for new trial. Accordingly, Pinson's appeal is now properly before this court.

## ANALYSIS

**Sufficiency of the Evidence**. Pinson claims the evidence was insufficient to support his conviction for rape of a child. Specifically, he contends there was inadequate proof of sexual penetration. The States argues in response that sufficient evidence of penetration was presented and that a rational jury could have found Pinson guilty beyond a reasonable doubt. Upon review of the record, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."

The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

Pinson was convicted under Tennessee Code Annotated section 39-13-522(a), which states:

(a) Rape of a child is the unlawful sexual penetration of a victim by the

-8-

defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age.

Section 39-13-501(7) defines "sexual penetration" as follows:

"Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]

In this case, a rational jury could have found that Pinson sexually penetrated the victim. Lana Pinson testified that in April of 2007, the victim stayed overnight at her residence. She said the victim shared a bed with her and Pinson. The victim testified that he slept in the middle of the bed between Lana and Pinson. During the night, the victim said Pinson "put his business in my behind." At trial, the victim was asked, "Did it go plumb inside?" The victim responded, "Yes." The victim said it hurt and that he started crying. Lana testified that she woke up that night because the bed started moving. She said when the bed started moving, it "felt like somebody was having sex." Lana testified that the bed was moving for between five and ten minutes. Lana heard the victim say, "'It hurt. It hurt.'" She nudged Pinson and "he said he wasn't doing nothing or he was masturbating." Lana testified that after nudging Pinson, she told him to leave the victim alone. Lana explained that she was concerned the victim might have been hurt.

Dr. Piercey testified that she performed a physical examination of the victim. She discovered two anal fissures, which she concluded were the result of either penetration or constipation. She believed the fissures were caused within two weeks of the physical examination on May 7. Dr. Piercey also conducted a patient history, and she documented the results in a written report. She reported that the victim said Pinson "'touched my private part and my butt with his hands and he put his private part in my butt.'" Dr. Piercey also testified that:

When I asked [the victim] to give more details about what happened, he states that Joseph would be naked and then "pull my pants down and stick it in my butt." He also states that "Joseph put his tongue in my mouth and put his mouth on my private part."

She said the victim also stated that after the incident, Pinson told him "'don't tell anybody or I won't be your friend.'" Dr. Piercey testified that the victim gave no indication that he was being deceptive or untruthful. In considering the foregoing evidence in the light most

favorable to the State, we conclude that sufficient evidence was presented that Pinson sexually penetrated the victim.

We note that conflicting testimony was presented about the issue of constipation. Dr. Piercey testified that during the patient history, she asked the victim and his mother about whether the victim was constipated. Based on their responses, she concluded the fissures were not the result of constipation. Dr. Piercey did not, however, include these findings in her report. The victim's mother offered contradictory testimony about whether her son was constipated following the incident at the Pinsons' home. First, she testified that the victim was constipated after she noticed the hickey on his neck. She recalled telling Dr. Piercey that the victim was constipated. Later, the victim's mother said she did not tell Dr. Piercey about the constipation. Rather, she recalled telling her family physician, Dr. Peters, about the constipation two weeks before she learned of the misconduct at the Pinsons' home. The victim's mother did not recall Dr. Piercey even asking about constipation. Lastly, the victim's mother testified that the victim was not constipated during the month of April. She said she knew the victim was not constipated because he complained of his "butt hurting." The victim's mother testified that the victim never told her he was constipated. Despite the conflicting testimony about the issue of constipation, we maintain that a rational jury could have found that Pinson sexually penetrated the victim.

After reviewing the evidence in the light most favorable to the State, we hold that sufficient evidence was presented to support Pinson's conviction. A rational jury could have found that Pinson sexually penetrated the victim, who was seven years old at the time of the rape. Accordingly, Pinson is not entitled to relief.

**CONCLUSION**

Based on the foregoing, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE